Hans W. Herb
LAW OFFICE OF HANS W. HERB
P.O. Box 970
Santa Rosa, CA  95402
Telephone:  (707) 576-0757
Email:  hans@tankman.com

Xhavin Sinha
SINHA LAW
2445 Augustine Drive, Suite 150
Santa Clara, CA 95054
Telephone:  (408) 791-0432
Email:  xsinha@sinha-law.com


Attorneys for Plaintiff
EDEN ENVIRONMENTAL CITIZEN'S GROUP, LLC

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EDEN ENVIRONMENTAL CITIZEN'S GROUP, LLC, a California limited liability company,<br><br>        Plaintiff,<br><br>    vs.<br><br>WOODLAND WOOD PRESERVERS, LTD., a Delaware corporation; AMAR S. DOMAN, an individual; JAMES CODE, an individual; and DOES 1-10, inclusive,<br><br>        Defendants. | Case No.:<br><br>COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF, CIVIL PENALTIES AND REMEDIATION<br><br>(Federal Water Pollution Control Act, 33 U.S.C. §§1251 et seq.) |

      Plaintiff EDEN ENVIRONMENTAL CITIZEN'S GROUP, LLC ("EDEN") hereby

brings this civil action pursuant to the Federal Water Pollution Control Act, also known as the

Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq.*

## INTRODUCTION

1.     This action is a citizen suit for injunctive relief, declaratory relief, civil penalties, and remediation against Defendants for current and ongoing violations of the National Pollutant Discharge Elimination System ("NPDES") permit requirements of the CWA.

2.     On or about July 18, 2019, EDEN provided a Notice of Defendants' violations of the CWA to the (1) Administrator of the United States Environmental Protection Agency ("EPA"), (2) EPA's Regional Administrator for Region Nine, (3) Executive Director of the State Water Resources Control Board ("State Board") and (4) to Defendants, including a copy delivered to the Facility Manager of Defendant Woodland Wood Preservers, Ltd, by certified mail, at 1492 Churchill Downs, Woodland, California ("the Facility"), as required by the CWA. 33 U.S.C. § 1365(b)(1)(A).

3.     A copy of EDEN's Notice of Intent to Sue is attached hereto as Exhibit "A" and incorporated herein by reference.

4.     More than sixty days have passed since EDEN's Notice was properly and lawfully served on Defendants, the State Board, and the Regional and National EPA Administrators.  EDEN is informed and believes, and thereupon alleges, that neither the National EPA, nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint. This action's claim for civil penalties is not barred by any prior administrative penalty under section 309(g) of the CWA, 33 U.S.C. § 1319(g).

## JURISDICTION and VENUE

5.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. section 1331 (federal question), and 33 U.S.C. section 1365(a) (CWA citizen suit jurisdiction).

The relief requested is authorized pursuant to 28 U.S.C. sections 2201-2202 (declaratory relief), 33 U.S.C. sections 1319(b), 1365(a) (injunctive relief), and 33 U.S.C. sections 1319(d), 1365(a) (civil penalties).

6.     Venue is proper because Defendants reside in and the events or omissions giving rise to EDEN's claims occurred in this District. 28 U.S.C. §1391(b)(1), (2). Venue is also proper because the Facility's CWA violations have occurred and are occurring within the District. 33 U.S.C. § 1365(c)(1).

## PARTIES

7.     Plaintiff EDEN ENVIRONMENTAL CITIZEN'S GROUP, LLC ("EDEN") is an environmental membership group organized under the laws of the State of California as a limited liability company on June 1, 2018.  EDEN previously existed as an unincorporated environmental citizen's association, with members who remain associated with EDEN as of the date of the filing of this Complaint.

8.     EDEN's organizational purpose is the protection, preservation and enhancement of California's waterways.   Its mission is implemented by enforcing the provisions of the Federal Clean Water Act and California's Industrial General Permit by seeking redress from environmental harms caused by Industrial Dischargers who pollute the Waters of the United States, through community education and citizen suit enforcement when necessary.

9.     EDEN's members donate their time and money resources to protect, enhance, and assist in the preservation and restoration of rivers, creeks, streams, wetlands, vernal pools, and their tributaries located in California.

10.     EDEN has members throughout California.  Some of EDEN's members reside and work near the Sacramento River (the "Receiving Waters" for Defendant Woodland Wood

Preservers' Facility storm water run-off), and use those waters and their watersheds for surfing, kayaking, camping, cycling, recreation, sports, fishing, swimming, hiking, photography, nature walks and scientific study.  Their use and enjoyment of these natural resources have been and continue to be adversely impaired by Defendants' failure to comply with the procedural and substantive requirements of the California Industrial General Permit and Federal Clean Water Act.

11.     EDEN has standing as an association to bring this suit against Defendants, as at least three of EDEN's current members are experiencing ongoing and continuing harm particular to him or her as a specific result of Defendants' violations of the CWA, and the resulting adverse effects to the environment and the Receiving Waters downstream from the Facility and has experienced such harm since at least the date that EDEN provided to Defendants a 60-day Notice of Intent to Sue.

12.     Specifically, the aesthetic and recreational interests of the individual members of EDEN with standing have been diminished, limited and harmed specifically from Defendants' violations of the CWA, due to the pollution caused by Defendants' environmental violations that EDEN's members believe has entered into the Facility's Receiving Waters.

13.     Defendants' ongoing violations of the General Permit and the CWA have and will continue to cause irreparable harm to EDEN and certain of its current members, for which they have no plain, speedy, or adequate remedy.  The relief requested will redress the ongoing injury in fact to EDEN and its members.  Litigation of the claims asserted and the relief requested in this Complaint will not require the participation in this lawsuit of individual members of EDEN.

14.     EDEN is informed and believes, and on such information and belief alleges, that Defendant WOODLAND WOOD PRESERVERS, LTD. ("Woodland Wood Preservers"),

located at 1492 Churchill Downs, in Woodland, California, is a Delaware corporation, which was registered to do business in California on or about December 6, 2018.

15.     EDEN is informed and believes, and on such information and belief alleges that Defendant AMAR S. DOMAN is the Chief Executive Officer for Defendant Woodland Wood Preservers, according to the documents on file with the Secretary of State.

16.     EDEN is informed and believes, and on such information and belief alleges that Defendant JAMES COLE is the Chief Financial Officer for Defendant Woodland Wood Preservers, according to the documents on file with the Secretary of State.

## STATUTORY BACKGROUND

17.     Congress declared that the Federal Clean Water Act was designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters" through federal and state cooperation to develop and implement "programs for preventing, reducing, or eliminating the pollution of navigable waters and ground waters." 33 U.S.C. §§ 1251(a), 1252(a).

18.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

19.     Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program. 33 U.S.C. § 1342(p). States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to dischargers or through the issuance of a

single, statewide general permit applicable to all industrial storm water dischargers. 33 U.S.C. § 1342(p).

20.     Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the U.S. EPA has authorized California's State Board to issue NPDES permits including general NPDES permits in California.

**General Permit**

21.     The State Board elected to issue a statewide general permit for industrial storm water discharges. The State Board originally issued the General Permit on November 19, 1991, and modified it on September 17, 1992.   The State Board reissued the General Permit on April 17, 1997, and again on April 1, 2014 (the "2015 Permit" or "General Permit"), pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p). The 1997 Permit was in effect between 1997 and June 30, 2015.  The 2015 Permit went into effect on July 1, 2015.  The 2015 Permit maintains or makes more stringent the same requirements as the 1997 Permit.

22.     In order to discharge storm water lawfully in California, industrial dischargers must comply with the terms of the General Permit or have obtained and complied with an individual NPDES permit. 33 U.S.C. § 1311(a).

23.     The General Permit contains several prohibitions. Effluent Limitation V(A) of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.  Discharge Prohibition III(C) of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.

24.     Receiving Water Limitation VI(B) of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment. Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

25.     In addition to absolute prohibitions, the General Permit contains a variety of substantive and procedural requirements that dischargers must meet.  Facilities discharging, or having the potential to discharge, storm water associated with industrial activity which have not obtained an individual NPDES permit must apply for coverage under the State's General Permit by filing a Notice of Intent to Comply ("NOI").  Dischargers have been required to file NOIs since March 30, 1992.

26.     Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP"). The SWPPP must describe storm water control facilities and measures that comply with the BAT and BCT standards.  The objective of the SWPPP requirement is to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges and authorized non-stormwater discharges from the facility, and to implement best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water discharges and authorized non-storm water discharges. General Permit, § X(C). These BMPs must achieve compliance with the General Permit's effluent limitations and receiving water limitations, including the BAT and BCT technology mandates.

27.     To ensure compliance with the General Permit, the SWPPP must be evaluated and revised as necessary. General Permit, § X(B).

28.     Failure to develop or implement an adequate SWPPP, or to update or revise an existing SWPPP as required, is a violation of the General Permit. General Permit, Fact Sheet §I(1).

29.     Sections X(D) – X(I) of General Permit set forth the requirements for a SWPPP. Among other requirements, the SWPPP must include: a pollution prevention team; a site map; a list of significant materials handled and stored at the site; a description of potential pollutant sources; an assessment of potential pollutant sources; and a description of a specific mandatory set of minimum BMPs to be implemented at the facility that will reduce or prevent pollutants in storm water discharges and authorized non-stormwater discharges.

30.     The General Permit further requires dischargers to implement and maintain, to the extent feasible, any one or more of the following advanced BMPs necessary to reduce or prevent discharges of pollutants in industrial storm water discharges: exposure minimization BMPs, storm water containment and discharge reduction BMPs, treatment control BMPs, and other advanced BMPs.  General Permit, § X(H)(2).  Failure to implement advanced BMPs as necessary to achieve compliance with either technology or water quality standards is a violation of the General Permit.

31.     The General Permit also requires that the SWPPP include BMP Descriptions and a BMP Summary Table.  General Permit, § X(H)(4), (5).

32.     The General Permit requires dischargers to develop and implement an adequate written Monitoring and Reporting Program. The primary objective of the Monitoring and Reporting Program is to detect and measure the concentrations of pollutants in a facility's

discharge to ensure compliance with the General Permit's discharge prohibitions, effluent limitations, and receiving water limitations.

33.     As part of their monitoring program, Dischargers must identify all storm water discharge locations that produce a significant storm water discharge, evaluate the effectiveness of BMPs in reducing pollutant loading, and evaluate whether pollution control measures set out in the SWPPP are adequate and properly implemented.

34.     Section XI(B) of the General Permit requires that Dischargers collect and analyze storm water samples from two qualifying storm events ("QSEs") during the first half of each reporting year (July 1 to December 31) and two QSEs during the second half of each reporting year (January 1 to June 30), and that the samples be collected from all outfalls identified in the Facility SWPPP.

35.     A QSE is a precipitation event that produces a discharge for at least one drainage area and is preceded by 48 hours with no discharge from any drainage area.  General Permit §XI(B)(2)

36.     Once the storm water samples have been collected, the General Permit requires that the Discharger deliver the samples to a qualified laboratory for analysis within 48 hours of collection (General Permit, Attachment H) and upload into SMARTS the resulting laboratory reports within 30 days from receipt of the report.  General Permit § XI(B)(4)

37.     Facilities are also required to make monthly visual observations of storm water discharges. The visual observations must represent the quality and quantity of the facility's storm water discharges from the storm event.  General Permit, § XI(A)

38.     The General Permit requires operators to conduct an Annual Comprehensive Facility Compliance Evaluation ("Annual Evaluation") that evaluates the effectiveness of current

BMPs and the need for additional BMPs based on visual observations and sampling and analysis results. General Permit, § XV.

39.     Under the General Permit, facilities must analyze storm water samples for pH, oil & grease and total suspended solids, as well as additional parameters indicated in the Permit by facility type and those parameters identified by the Discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment.  General Permit, § XI(B)(6)(c).

40.     The US EPA has established Parameter Benchmark Values as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT. These benchmarks represent pollutant concentrations at which a storm water discharge could potentially impair, or contribute to impairing, water quality, or affect human health from ingestion of water or fish.

41.     The Numeric Action Levels ("NALs") in the General Permit are derived from these benchmarks. The Permit incorporates annual NALs, which are derived from the 2008 MSGP benchmark values, and instantaneous maximum NALs, which are derived from a Water Board dataset.

42.     An exceedance of an annual NAL occurs when the average of all samples obtained for an entire facility during a single reporting year is greater than a particular annual NAL. The reporting year runs from July 1 to June 30.  An instantaneous maximum NAL exceedance occurs when two or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value (for TSS and O&G) or are outside of the instantaneous maximum NAL range for pH.  General Permit §XII(A)

43.     When a discharger exceeds an applicable NAL, it is elevated to "Level 1 Status," which requires a revision of the SWPPP and additional BMPs. If a discharger exceeds an applicable NAL during Level 1 Status, it is then elevated to "Level 2 Status."  General Permit § XII(C)

44.     For Level 2 Status, a discharger is required to submit an Action Plan requiring a demonstration of either additional BMPs to prevent exceedances, a determination that the exceedance is solely due to non-industrial pollutant sources, or a determination that the exceedance is solely due to the presence of the pollutant in the natural background.  General Permit §XII(D)

45.     Section XVI(A) of the General Permit requires that all Dischargers must certify and submit via SMARTS an Annual Report no later than July 15th following each reporting year using the standardized format and checklists in SMARTS.

Central Valley Region Basin Plan

46.     The Regional Board has identified beneficial uses of the Central Valley Region's waters and established water quality standards for the Sacramento River and its tributaries and the Sacramento-San Joaquin Delta in "The Water Quality Control Plan (Basin Plan) for the California Regional Water Quality Control Board, Central Valley Region – *The Sacramento River Basin and The San Joaquin River Basin*," generally referred to as the Basin Plan, and the "Water Quality Control Plan for the San Francisco Bay/Sacramento-San Joaquin Delta Estuary."

47.     The beneficial uses of these waters include, among others, domestic and municipal supply, water contact recreation, non-contact water recreation, wildlife habitat, warm and cold freshwater habitat, and fish spawning. The non-contact water recreation use is defined as "uses of water for recreational activities involving proximity to water, but where there is

generally no body contact with water, nor any likelihood of ingestion of water. These uses include, but are not limited to, picnicking, sunbathing, hiking, camping, boating. . . hunting, sightseeing, or aesthetic enjoyment in conjunction with the above activities."

48.    The Basin Plan includes a narrative toxicity standard which states that all waters shall be maintained free of toxic substances in concentrations that produce detrimental physiological responses in human, plant, animal, or aquatic life.

49.    The Basin Plan provides that water shall not contain floating material in amounts that cause nuisance or adversely affect beneficial uses.

50.    The Basin Plan provides that water shall be free of discoloration that causes nuisance or adversely affects beneficial uses.

51.    The Basin Plan provides that waters shall not contain suspended materials in concentrations that cause nuisance or adversely affect beneficial uses.

52.    The Basin Plan also prohibits the discharges of oil and grease, stating that waters shall not contain oils, greases, waxes, or other materials in concentrations that cause nuisance, result in a visible film or coating on the surface of the water or on objects in the water, or otherwise adversely affect beneficial uses.

53.    The Basin Plan provides that at a minimum, water designated for use as domestic or municipal supply (MUN) shall not contain concentrations of chemical constituents in excess of the maximum contaminant levels (MCLs) specified in the following provisions of Title 22 of the California Code of Regulations, which are incorporated by reference into this plan: Tables 64431-A (Inorganic Chemicals) and 64431-B (Fluoride) of Section 64431, Table 64444-A (Organic Chemicals) of Section 64444, and Tables 64449-A (Secondary Maximum Contaminant

Levels-Consumer Acceptance Limits) and 64449-B (Secondary Maximum Contaminant Levels-Ranges) of Section 64449.

54.   Title 22 of the California Code of Regulations provides a MCL for aluminum of 1.0 mg/L, for Cadmium of .01 mg/L, and lead of .05 mg/L.

<u>Citizen Suit Provision of the CWA</u>

55.   Under the CWA, any citizen may commence a civil action against any person who is alleged to be in violation of an effluent standard or limitation under the CWA or an Order issued by a State with respect to such a standard or limitation." 33 U.S.C. §1365(a)(1). No action may be commenced prior to sixty days after the plaintiff has given notice of the alleged violation (i) to the Administrator of the EPA, (ii) to the State in which the alleged violation occurs, and (iii) to any alleged violator of the standard, limitation, or order." 33 U.S.C. § 1365(b)(1)(A).  By including a citizen suit provision in the CWA, Congress ensured that the purposes and requirements of the CWA would be enforced, either by the United States government or by concerned citizens.

56.   In furtherance of the water preservation goals established by the CWA, the citizen suit provision confirms the district court's jurisdiction to apply any appropriate civil penalties under section 1319(d).  33 U.S.C. § 1365(a). Section 1319(d) declares that any person who violates any permit condition or limitation implementing any of such sections in an NPDES permit shall be subject to a civil penalty not to exceed $46,192 per day for each violation occurring before November 2, 2015, and $51,570.00 per day per violation for violations occurring after November 2, 2015.   33 U.S.C. § 1319(d); 40 C.F.R. § 19.4; General Permit XXI.Q.1.

57.     Violations of provisions of the General Permit, including those detailed below, constitute violations of the CWA and are subject to civil penalties. General Permit § XXI; 33 U.S.C. §§ 1319(d), 1342; 40 C.F.R. §§ 19.1-19.4.

## FACTUAL ALLEGATIONS WHICH GIVE RISE TO CLAIMS

58.     Defendant Woodland Wood Preservers is a wood preserving facility.  EDEN is informed and believes that the Facility falls under standard industrial classification ("SIC") code 2491.

59.     EDEN is informed and believes that Woodland Wood Preservers stores industrial materials outdoors that can be exposed to storm water, eroded by wind, and otherwise contaminate the surrounding watershed.

60.     Based on EDEN's investigation, including a review of the Facility's Notice of Intent to Comply with the Terms of the Industrial General Permit ("NOI"), SWPPP, aerial photography, and EDEN's information and belief, storm water is collected and discharged from the Facility through a series of channels that discharge via at least one outfall.  The outfall discharges storm water and pollutants contained in that storm water directly into Cache Creek, which flows to the Sacramento River, a navigable Water of the United States.

61.     Plaintiff is informed and believes, and thereupon alleges that the storm water flows over the surface of the Facility where industrial activities occur and areas where airborne materials associated with the industrial processes at the facility may settle onto the ground. Plaintiff is informed and believes, and thereupon alleges that storm water flowing over these areas collects suspended sediment, oil & grease, copper, arsenic, aluminum, COD, and other pollutants as it flows towards the storm water channels.

62.     On information and belief, Plaintiff alleges that there are insufficient structural storm water control measures installed at the Facility.  Plaintiff is informed and believes, and thereupon alleges, that the management practices at the Facility are currently inadequate to prevent the sources of contamination described above from causing the discharge of pollutants to waters of the United States.

Failure to Apply for NPDES Coverage Under the General Permit

63.     Defendant Woodland Wood Preservers began its operations at the Facility on or about December 6, 2018.

64.     Defendants' SIC code requires it to obtain NPDES coverage under the General Permit.

65.     Defendant Woodland Wood Preservers has failed to date to apply for NPDES coverage under the General Permit for its Facility and is currently discharging storm water into the Sacramento River watershed from the Facility without a Permit, in violation of the CWA.

Failure to Develop and Implement a SWPPP and Site Map

66.     On information and belief, Plaintiff alleges that since at least December 6, 2018, Defendants have failed to develop and implement a Storm Water Pollution Prevention Plan (SWPPP) for the Facility.  Furthermore, Defendants have failed to develop a Site Map.

67.     Information available to EDEN indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events into the Sacramento River.

68.     Information available to Plaintiff indicates that Defendants have not fulfilled the requirements set forth in the General Permit for discharges from the Facility due to the continued

discharge of contaminated storm water.  Plaintiff is informed and believes, and thereupon alleges, that all the violations alleged in this Complaint are ongoing and continuing.

### Monitoring and Reporting

69.     On information and belief, EDEN alleges that Woodland Wood Preservers has no monitoring program at its Facility.

70.     On information and belief, EDEN alleges that during the 2018-2019 reporting year, Defendants failed to collect and analyze two storm water samples from the first half of the reporting year and two storm water samples from the second half of the reporting year.

71.     On information and belief, EDEN alleges that during the 2019-2020 reporting year to date, Defendants failed to collect and analyze any storm water samples at its Facility.

72.     On information and belief, EDEN alleges that Defendants have failed to conduct monthly visual observations of storm water discharges at the Facility since at least December 6, 2018.

### Failure to File Annual Reports

73.     EDEN is informed and believes that Defendants have failed to comply with Section XVI(A) of the General Permit, which provides that Dischargers shall certify and submit via SMARTS an Annual Report no later than July 15th following each reporting year using the standardized format and checklists in SMARTS.

74.     Specifically, Woodland Wood Preservers' Annual Report for the reporting year 2018-19 was due on or before July 15, 2019.

75.     To date, Woodland Wood Preservers' Annual Report for the reporting year 2018-19 has not been filed and is currently outstanding.

Failure to Implement BAT/BCT and BMPs

76.     EDEN is informed and believes that Woodland Wood Preservers has failed to identify and implement Best Management Practices ("BMPs") at its Facility that comply with the requirements of the General Permit for best conventional treatment (BCT) for conventional pollutants, and best available technology (BAT) for toxic and non-conventional pollutants. These technology-based pollution controls are required to be implemented in a manner that reflects best industry practice considering technological availability and economic practicability and achievability.  General Permit §§ I(C), V(A).

77.     Information available to EDEN indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events from the Facility to the Sacramento River.

Discharges of Contaminated Storm Water

78.      Since commencement of Facility operations on or about December 8, 2018, Defendants have failed to collect and analyze even one Facility storm water run-off sample.

79.     Information available to EDEN indicates that unauthorized non-storm water discharges occur at the Facility due to inadequate BMP development and/or implementation necessary to prevent these discharges.

80.     Due to the nature of the operations at the Facility, coupled with the documented lack of proper BMP implementation and unauthorized non-storm water discharges, Defendants are discharging storm water containing excessive levels of pollutants specific to their operation during at least every significant local rain event.

Failure to Train Employees and Designate a Pollution Prevention Team

81.     The General Permit require all Facilities to designate a Legally Responsible Person to implement the requirements of the Permit, who is then responsible for appointing a Pollution Prevention Team and ensuring that the Team is properly trained in at least the following minimum requirements: BMP implementation, BMP effectiveness evaluations, visual observations, and monitoring activities.

82.     Defendants' failure to train its employees and designate a Pollution Prevention Team is evidenced by the Facility's failure to develop and implement a SWPPP or adequate BMPs at the Facility, failure to conduct monthly visual observations, and failure to to comply with required storm water sampling and analysis procedures.

## FIRST CAUSE OF ACTION
### Failure to Apply for NDPES Coverage under the General Permit
### Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

83.     Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

84.     The General Permit contains, in Attachment A, a list of Standard Industrial Classification (SIC) Codes which indicate the types of facilities which must apply for coverage under the General Permit.

85.     Defendant Woodland Wood Preservers' facility SIC Code (reflecting its primary operation) is included among those industries which must apply for General Permit coverage.

86.     Defendants operated without General Permit coverage at the Facility since at least December 6, 2018.

87.     Each day since at least December 6, 2018 that Defendants failed to apply for General Permit coverage in violation of the General Permit is a separate and distinct violation of

the General Permit against all Defendants. Noncompliance with the General Permit constitutes a violation of the CWA against all Defendants.  General Permit § XXI.A; 33 U.S.C. § 1342.

**SECOND CAUSE OF ACTION**
**Failure to Prepare, Implement, Review, and Update**
**an Adequate Storm Water Pollution Prevention Plan**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

88.     Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

89.     The General Permit requires dischargers of storm water associated with industrial activity to develop and implement an adequate SWPPP.

90.     As outlined herein, Defendants have failed to develop and implement any SWPPP for the Facility.

91.     Each day since December 6, 2018, that Defendants failed to develop, implement and update an adequate SWPPP for the Facility is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a) against all Defendants.

**THIRD CAUSE OF ACTION**
**Failure to Develop and Implement an**
**Adequate Monitoring and Reporting Program**
**(Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

92.     Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

93.     The General Permit requires dischargers of storm water associated with industrial activity to have developed and be implementing a monitoring and reporting program (including sampling and analysis of discharges) that complies with the terms of the General Permit.

94.     As outlined herein, Defendants have failed to develop and implement an adequate monitoring and reporting program for its Facility.

95.     Defendant Woodland Wood Preservers' ongoing failure to develop and implement an adequate monitoring and reporting program are evidenced by its failure to collect storm water samples pursuant to the requirements of the General Permit.

96.     Each day since at least December 6, 2018, that Defendants have failed to develop and implement an adequate monitoring and reporting program for its Facility in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a) against all Defendants. The absence of requisite monitoring and analytical results are ongoing and continuous violations of the Act.

97.     Noncompliance with the General Permit constitutes a violation of the CWA against all Defendants. General Permit § XXI.A; 33 U.S.C. § 1342.

**FOURTH CAUSE OF ACTION**
**Failure to Submit Annual Reports to the Regional Water Board**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

98.     Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

99.     The General Permit requires that all Dischargers certify and submit via SMARTS an Annual Report no later than July 15th following each reporting year.

100.    As delineated herein, Woodland Wood Preservers failed to file its Annual Report for the reporting year 2018-19 by July 15, 2019.

101.    Each day since July 15, 2019, that Defendants have failed to submit Woodland Wood Preservers' Annual Report to the Regional Water Board in a timely manner is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a) against all Defendants.

**FIFTH CAUSE OF ACTION**
**Failure to Implement the Best Available and**
**Best Conventional Treatment Technologies**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

102.    Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

103.    The General Permit's SWPPP requirements and Effluent Limitation V(A) of the General Permit require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.

104.    Defendants failed to implement BAT and BCT at the Facility for its discharges of TSS, COD, Oil & Grease, Arsenic, Aluminum, Copper, and other potentially un-monitored pollutants, in violation of Effluent Limitation V(A) of the General Permit.

105.    Each day since at least December 6, 2018, that Defendants have failed to develop and implement BAT and BCT in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a) against all Defendants.

**SIXTH CAUSE OF ACTION**
**Discharges of Contaminated Storm Water**
**in Violation of Permit Conditions and the Act**
**(Violations of 33 U.S.C. §§ 1311, 1342)**

106.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

107.    Discharge Prohibition III(C) of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.  Receiving Water VI(B) of the General Permit prohibits storm water

discharges to any surface or ground water that adversely impact human health or the environment. Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

108.    Plaintiff is informed and believes, and thereupon alleges, that since at least December 6, 2018, Defendant Woodland Wood Preservers has been discharging polluted storm water from the Facility, in excess of applicable water quality standards in violation of Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the General Permit.

109.    During every rain event, storm water flows freely over exposed materials, waste products, and other accumulated pollutants at both facilities, becoming contaminated with iron, sediment, zinc, nitrates, phosphorus and other potentially un-monitored pollutants at levels above applicable water quality standards. The storm water then flows untreated into Sacramento River.

110.    Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are causing or contributing to the violation of the applicable water quality standards in a Statewide Water Quality Control Plan and/or the applicable Regional Board's Basin Plan in violation of Receiving Water Limitations of the General Permit.

111.    Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are adversely affecting human health and the environment in violation of Receiving Water Limitations of the General Permit.

112.    Every day since at least December 6, 2018, that Defendant Woodland Wood Preservers has discharged and continues to discharge polluted storm water from its Facility in

violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a) against all Defendants.  These violations are ongoing and continuous.

## SEVENTH CAUSE OF ACTION
### Failure to Properly Train Facility Employees and Pollution Prevention Team
### (Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

113.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

114.    Section X.D.1 of the General Permit requires each Facility to establish a Pollution Prevention Team who is then responsible for assisting with the implementation of the requirements of the General Permit. The Facility is also required to identify alternate team members to implement the SWPPP and conduct required monitoring when the regularly assigned Pollution Prevention Team members are temporarily unavailable (due to vacation, illness, out of town business, or other absences).

115.    Section X.H.f of the General Permit also requires that each facility ensure that all of its Pollution Prevention Team members implementing the various compliance activities of the General Permit are properly trained in at least the following minimum requirements: BMP implementation, BMP effectiveness evaluations, visual observations, and monitoring activities. Further, if a Facility enters Level 1 status, appropriate team members must be trained by a QISP.

116.    Since at least December 6, 2018, Defendants have failed to properly train Facility employees and the designated members of its Pollution Prevention Team, which has resulted in the General Permit violations alleged herein.

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment providing the following relief:

1.     Declare Defendants to have violated and to be in violation of the CWA;

2.     Issue an injunction ordering Defendants to immediately operate the Facility in compliance with the NPDES permitting requirements contained in the General Permit and the CWA;

3.     Enjoin Defendants from discharging pollutants from Defendant Woodland Wood Preservers' Facility to the surface waters surrounding the Facility until such time as Woodland Wood Preservers has developed and implemented an adequate SWPPP and implemented appropriate BMPs;

4.     Order Defendants to pay civil penalties of $51,570 per day/per violation for each violation of the Act pursuant to 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1, 19.2-19.4;

5.     Order Defendants to take appropriate actions to restore the quality of United States waters impaired by its activities at Woodland Wood Preservers' Facility;

6.     Order Defendants to pay EDEN's reasonable attorneys' fees and costs (including expert witness fees), as provided by 33 U.S.C. § 1365(d) and applicable California law;

7.     Award Plaintiff additional attorney fees under California Code of Civil Procedure §1021.5, to the extent that Plaintiff's Notice of Intent to Sue directed to Defendants was the catalyst for Defendants' voluntary corrective action or cessation of the violations included in Plaintiff's Notice, provided that Defendants undertook any such corrective action after receiving Plaintiff's Notice, and;

8.     Award such other and further relief as may be just and proper.

Dated: September 22, 2019                    Respectfully,

By: __*/S/ Hans W. Herb*_____
     Hans W. Herb
     Attorney for Plaintiff



# EDEN

*Eden Environmental Citizen's Group, LLC*

July 18, 2019

<u>Via US Mail, Certified</u>   USPS Tracking No. 9407 1118 9956 1475 8654 39

Facility Manager
Woodland Wood Preservers, Ltd.
1492 Churchill Downs
Woodland, CA  95776

<u>Via US Mail and Email</u>

Amar S. Doman            amar.doman@canwel.com
Ali Mahdavi              ali.mahdavi@canwel.com
CanWel Building Materials Group Ltd.
PO Box 11135, STN Royal Centre
Vancouver BC V6E 3P3

CT Corporation System
Agent for Service
Woodland Wood Preservers, Ltd.
818 W. 7th Street, Ste 930
Los Angeles, CA  90017

**Re:    60-Day Notice of Violations and Intent to File Suit Under the Federal Water
         Pollution Control Act ("Clean Water Act")**

To Officers, Directors, Operators, Property Owners/Landlords, and/or Facility Managers of
Woodland Wood Preservers, Ltd, fka Western Wood Treating:

        This letter is being sent to you on behalf of Eden Environmental Citizen's Group, LLC
("EDEN") to give legal notice that EDEN intends to file a civil action against Woodland Wood
Preservers, Ltd., formerly known as Western Wood Treating ("Discharger"), and CanWel

---

2151 Salvio Street #A2-319    Concord, CA  94520
Telephone:  925-732-0960    Email:  *edenenvcitizens@gmail.com*
Website:                              **edenenvironmental.org**

Building Materials Group, Ltd., its parent corporation, as well as Amar S. Doman, its Chief Executive Officer, for violations of the Federal Clean Water Act ("CWA" or "Act") 33 U.S.C. § 1251 *et seq.,* that EDEN believes are occurring at the Woodland Wood Preservers facility located at 1492 Churchill Downs in Woodland, California ("the Facility" or "the site").

EDEN is an environmental citizen's group established under the laws of the State of California to protect, enhance, and assist in the restoration of all rivers, creeks, streams, wetlands, vernal pools, and tributaries of California, for the benefit of its ecosystems and communities.

EDEN formally registered as a limited liability company (LLC) association with the California Secretary of State on June 22, 2018; however, since at least July 1, 2014, EDEN has existed as an unincorporated environmental citizen's association with members who remain associated with EDEN as of the date of this Notice.

As discussed below, the Facility's discharges of pollutants degrade water quality and harm aquatic life in the Facility's Receiving Waters, which are waters of the United States and described in Section II.B, below.  EDEN has members throughout California.  Some of EDEN's members live, work, and/or recreate near the Receiving Waters and use and enjoy the Receiving Waters for surfing, kayaking, camping, fishing, boating, swimming, hiking, cycling, bird watching, picnicking, viewing wildlife, and/or engaging in scientific study.

At least one of EDEN's current members has standing to bring suit against Woodland Wood Preservers, as the unlawful discharge of pollutants from the Facility as alleged herein has had an adverse effect particular to him or her and has resulted in actual harm to the specific EDEN member(s).

Further, the Facility's discharges of polluted storm water and non-storm water are ongoing and continuous.  As a result, the interests of certain individual EDEN members have been, are being, and will continue to be adversely affected by the failure of Woodland Wood Preservers to comply with the General Permit and the Clean Water Act.

CWA section 505(b) requires that sixty (60) days prior to the initiation of a civil action under CWA section 505(a), a citizen must give notice of intent to file suit. 33 U.S.C. § 1365(b). Notice must be given to the alleged violator, the U.S. Environmental Protection Agency ("EPA"), and the State in which the violations occur.

As required by CWA section 505(b), this Notice of Violation and Intent to File Suit provides notice to the Discharger of the violations which have occurred and continue to occur at the Facility.  After the expiration of sixty (60) days from the date of this Notice of Violation and Intent to File Suit, EDEN intends to file suit in federal court against the Discharger under CWA section 505(a) for the violations described more fully below.

## I.      THE SPECIFIC STANDARD, LIMITATION, OR ORDER VIOLATED

EDEN's investigation of the Facility has uncovered significant, ongoing, and continuous violations of the CWA and the General Industrial Storm Water Permit issued by the State of California (NPDES General Permit No. CAS000001 [State Water Resources Control Board ("SWRCB")] Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ ("1997 Permit") and by Order No. 2014-0057-DWQ ("2015 Permit") (collectively, the "General Permit").

As more fully described in Section III, below, EDEN alleges that in its operations of the Facility, Woodland Wood Preservers has committed ongoing violations of the substantive and procedural requirements of the Federal Clean Water Act, California Water Code §13377; the General Permit, the Regional Water Board Basin Plan, the California Toxics Rule (CTR) 40 C.F.R. § 131.38, and California Code of Regulations, Title 22, § 64431.

## II.     THE LOCATION OF THE ALLEGED VIOLATIONS

### A.   The Facility

The location of the point sources from which the pollutants identified in this Notice are discharged in violation of the CWA is Woodland Wood Preservers' permanent facility address of 1492 Churchill Downs in Woodland, California.

Woodland Wood Preservers Facility is a wood preserving facility.  Facility operations are covered under Standard Industrial Classification Code (SIC) 2491.

Based on the EPA's Industrial Storm Water Fact Sheet for Sector A – Timber Products Facilities, polluted discharges from operations at the Facility contain bark and wood debris, total suspended solids (TSS), **arsenic, copper,** biochemical oxygen demand (BOD), chemical oxygen demand (COD, and oil and grease ("O&G").  Many of these pollutants are on the list of chemicals published by the State of California as known to cause cancer, birth defects, and/or developmental or reproductive harm.

Information available to EDEN indicates that the Facility's industrial activities and associated materials are exposed to storm water, and that each of the substances listed on the EPA's Industrial Storm Water Fact Sheet is a potential source of pollutants at the Facility.

### B.   The Affected Receiving Waters

The Facility discharges into, which then discharges to the Cache Creek, a tributary of the Sacramento River ("Receiving Waters").

The Sacramento River is a water of the United States.  The CWA requires that water bodies such as the Sacramento River meet water quality objectives that protect specific "beneficial uses." The Central Valley Regional Water Board has issued its *Water Quality Control Plan for the Sacramento and San Joaquin River Basins* ("Basin Plan") to delineate those water quality objectives.

The Basin Plan identifies the "Beneficial Uses" of water bodies in the region.  The Beneficial Uses for the Receiving Waters downstream of the Facility include: Municipal and Domestic Supply (MUN), Agricultural Supply (AGR), Industrial Process Supply (PRO), Industrial Service Supply (IND), Navigation (NAV), Water Contact Recreation (REC-1), Non-contact Water Recreation (REC-2), Warm Freshwater Habitat (WARM), Cold Freshwater Habitat (COLD), Wildlife Habitat (WILD), Migration (MIGR), and Spawning, Reproduction, and/or Early Development (SPWN).

A water body is impaired pursuant to section 303(d) of the Clean Water Act, 33 U.S.C. § 1313(d), when its Beneficial Uses are not being achieved due to the presence of one or more pollutants.

Polluted storm water and non-storm water discharges from industrial facilities, such as the Facility, contribute to the further degradation of already impaired surface waters, and harm aquatic dependent wildlife.

## III.      VIOLATIONS OF THE CLEAN WATER ACT AND GENERAL PERMIT

### A. *Failure to Apply For NPDES Coverage*

The CWA prohibits storm water discharges without a permit. 33 U.S.C. § 1342; 40 C.F.R. § 122.26.  The General Permit regulates operators of facilities subject to coverage under the National Pollutant Discharge Elimination System (NPDES) storm water permit, as these operators discharge storm water associated with specific industrial activities identified by both industrial activity and SIC (Standard Industrial Classification) codes in Attachment A of the Permit.

Woodland Wood Preservers' primary industrial activity is listed on Attachment A as an industrial activity subject to NPDES coverage.  Thus, the Facility was required to apply for coverage under the Permit in order to commence business operations, pursuant to Section I.Q of the Permit.

According to California Secretary of State records, Woodland Wood Preservers, formerly known as Western Wood Treating, commenced its operations at the site on or before November 10, 2006.  CanWel Building Materials Group, Ltd. acquired Western Wood Treating, Inc. on December 3, 2018, according to CanWel's Audited Public Financial Statements.  Thereafter,

CanWel registered Woodland Wood Preservers, Ltd. with the California Secretary of State on December 6, 2018.

As of the date of this Notice, Woodland Wood Preservers has failed to apply for NPDES coverage.

### B. *Failure to Develop and Implement a SWPPP and Site Map*

Woodland Wood Preservers has also failed to develop and implement either a Storm Water Pollution Prevention Plan ("SWPPP") or Site Map for the Facility.

Failure to develop or implement an adequate SWPPP is a violation of Sections II.B.4.f and X of the General Permit.

### C. *Failure to Develop, Implement and/or Revise a Monitoring and Reporting Program Pursuant to the General Permit*

Section XI of the General Permit requires Dischargers to develop and implement a storm water monitoring and reporting program ("M&RP") prior to conducting industrial activities. Dischargers have an ongoing obligation to revise the M&RP as necessary to ensure compliance with the General Permit.

The objective of the M&RP is to detect and measure the concentrations of pollutants in a facility's discharge, and to ensure compliance with the General Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. An adequate M&RP ensures that BMPs are effectively reducing and/or eliminating pollutants at the Facility, and it must be evaluated and revised whenever appropriate to ensure compliance with the General Permit.

1. Failure to Conduct Visual Observations

Section XI(A) of the General Permit requires all Dischargers to conduct visual observations at least once each month, and sampling observations at the same time sampling occurs at a discharge location.

Observations must document the presence of any floating and suspended material, oil and grease, discolorations, turbidity, odor and the source of any pollutants. Dischargers must document and maintain records of observations, observation dates, locations observed, and responses taken to reduce or prevent pollutants in storm water discharges.

EDEN believes that Woodland Wood Preservers has failed to conduct monthly and sampling visual observations pursuant to Section XI(A) of the General Permit.

2.   <u>Failure to Collect and Analyze Storm Water Samples</u>

In addition, EDEN alleges that Woodland Wood Preservers has failed to provide the Regional Water Board with annual documented results of Facility run-off sampling as required under Sections XI.B.2 and XI.B.11.a of Order No. 2014-0057-DWQ, in violation of the General Permit and the CWA.

Section XI.B.2 of the General Permit requires that all Dischargers collect and analyze storm water samples from two Qualifying Storm Events ("QSEs") within the first half of each reporting year (July 1 to December 31), and two (2) QSEs within the second half of each reporting year (January 1 to June 30).

As of the date of this Notice, Woodland Wood Preservers has failed to upload into the SMARTS database system *any* facility storm water run-off sample analyses.

### D.   *Failure to File Annual Reports*

Woodland Wood Preservers has failed to comply with Section XVI.A of the General Permit, which provides as follows:  "The Discharger shall certify and submit via SMARTS an Annual Report no later than July 15th following each reporting year using the standardized format and checklists in SMARTS."

To date, Woodland Wood Preservers has failed to file its Annual Report for the reporting year 2018-19.

### E.   *Deficient BMP Implementation*

Sections I.C, V.A and X.C.1.b of the General Permit require Dischargers to identify and implement minimum and advanced Best Management Practices ("BMPs") that comply with the Best Available Technology ("BAT") and Best Conventional Pollutant Control Technology ("BCT") requirements of the General Permit to reduce or prevent discharges of pollutants in their storm water discharge in a manner that reflects best industry practice, considering technological availability and economic practicability and achievability.

EDEN alleges that Woodland Wood Preservers has been conducting industrial activities at the site without adequate BMPs to prevent resulting non-storm water discharges.  Non-storm water discharges resulting from these activities are not from sources that are listed among the authorized non-storm water discharges in the General Permit, and thus are always prohibited.

Woodland Wood Preservers' failure to develop and/or implement adequate BMPs and pollution controls to meet BAT and BCT at the Facility violates and will continue to violate the

CWA and the Industrial General Permit each day the Facility discharges storm water without meeting BAT and BCT.

### F. *Discharges In Violation of the General Permit*

Except as authorized by Special Conditions of the General Permit, Discharge Prohibition III(B) prohibits permittees from discharging materials other than storm water (non-storm water discharges) either directly or indirectly to waters of the United States. Unauthorized non-storm water discharges must be either eliminated or permitted by a separate NPDES permit.

Information available to EDEN indicates that unauthorized non-storm water discharges occur at the Facility due to inadequate BMP development and/or implementation necessary to prevent these discharges.

EDEN alleges that the Discharger has discharged storm water containing excessive levels of pollutants from the Facility to its Receiving Waters during at least every significant local rain event over 0.1 inches since December 3, 2018.

EDEN hereby puts the Discharger on notice that each time the Facility discharges prohibited non-storm water in violation of Discharge Prohibition III.B of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

### G. *Failure to Comply with the Mandates of the Regional Water Board*

Pursuant to Section XIX of the General Permit, Regional Water Boards have general authority to enforce the provisions and requirements of the General Permit, including reviewing SWPPPs, Monitoring Implementation Plans, ERA Reports, and Annual Reports and requiring Dischargers to revise and re-submit PRDs, conducting compliance inspections, and taking enforcement actions.

As of the date of this Notice, Woodland Wood Preservers has failed to comply with mandates of the Regional Water Board that it apply for General Permit coverage.

### H. *Failure to Train Employees and Designate a Pollution Prevention Team*

Section X.D.1 of the General Permit requires each Facility to establish a Pollution Prevention Team, who is then responsible for assisting with the implementation of the requirements of the General Permit. The Facility is also required to identify alternate team members to implement the SWPPP and conduct required monitoring when the regularly assigned Pollution Prevention Team members are temporarily unavailable (due to vacation, illness, out of town business, or other absences).

In addition, Section X.H.f of the General Permit requires that each Facility ensure that all of its Pollution Prevention Team members implementing the various compliance activities of the General Permit are properly trained in at least the following minimum requirements: BMP implementation, BMP effectiveness evaluations, visual observations, and monitoring activities. Further, if a Facility enters Level 1 status, appropriate team members must be trained by a QISP.

As of the date of this Notice, Woodland Wood Preservers has failed to establish and train a Pollution Prevention Team, in violation of Sections X.D.1 and X.H.f of the General Permit.

Woodland Wood Preservers may have had other violations that can only be fully identified and documented once discovery and investigation have been completed.  Hence, to the extent possible, EDEN includes such violations in this Notice and reserves the right to amend this Notice, if necessary, to include such further violations in future legal proceedings.

### IV.    THE PERSON OR PERSONS RESPONSIBLE FOR THE VIOLATIONS

The entities responsible for the alleged violations are Woodland Wood Preservers, Ltd., as well as employees of the Facility responsible for compliance with the CWA, and its parent corporation, CanWel Building Materials Group Ltd., as well as Amar S. Doman, individually.

### V.    THE DATE, DATES, OR REASONABLE RANGE OF DATES OF THE VIOLATIONS

The range of dates covered by this 60-day Notice is from at least December 3, 2018, to the date of this Notice.  EDEN may from time to time update this Notice to include all violations which may occur after the range of dates covered by this Notice.  Some of the violations are continuous in nature; therefore, each day constitutes a violation.

### VI.    CONTACT INFORMATION

The entity giving this 60-day Notice is Eden Environmental Citizen's Group ("EDEN").

Aiden Sanchez
EDEN ENVIRONMENTAL CITIZEN'S GROUP
2151 Salvio Street #A2-319
Concord, CA  94520
Telephone:  (925) 732-0960
Email:  Edenenvcitizens@gmail.com  (emailed correspondence is preferred)
Website: edenenvironmental.org

To ensure proper response to this Notice, all communications should be addressed to EDEN's General Counsel, Hans W. Herb.

> HANS W. HERB
> Law Offices of Hans W. Herb
> P.O. Box 970
> Santa Rosa, CA  95402
> Telephone:  (707) 576-0757
> Email:  hans@tankman.com

## VII.     RELIEF SOUGHT FOR VIOLATIONS OF THE CLEAN WATER ACT

CWA §§ 505(a)(1) and 505(f) provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements and for un-permitted discharges of pollutants.  33 U.S.C. §§ 1365(a)(1) and (f), §1362(5).

Pursuant to Section 309(d) of the Clean Water Act, 33 U.S.C. § 1319(d), and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4, each separate violation of the Clean Water Act subjects the violator to a penalty for all violations occurring during the period commencing five (5) years prior to the date of the Notice Letter. **These provisions of law authorize civil penalties of $37,500.00 per day per violation for all Clean Water Act violations after January 12, 2009, and $51,570.00 per day per violation for violations that occurred after November 2, 2015.**

In addition to civil penalties, EDEN will seek injunctive relief preventing further violations of the Clean Water Act pursuant to Sections 505(a) and (d), 33 U.S.C. § 1365(a) and (d), declaratory relief, and such other relief as permitted by law.

**Lastly, pursuant to Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d) and California Code of Civil Procedure §1021.5, EDEN will seek to recover its pre and post-litigation costs, including all attorneys' and experts' fees and costs incurred** (see *Southern California Alliance of Publicly Owned Treatment Works v. U.S. Environmental Protection Agency* (9th Cir. 2017) 853 F.3d 1076; *Vasquez v. State of California* (2008) 45 Cal.4th 243).

### VIII.   CONCLUSION

The CWA specifically provides a 60-day notice period to promote resolution of disputes. EDEN encourages Woodland Wood Preservers' counsel to contact **EDEN's counsel** within 20 days of receipt of this Notice to initiate a discussion regarding the violations detailed herein.  Please do not contact EDEN directly.

During the 60-day notice period, EDEN is willing to discuss effective remedies for the violations; however, if Woodland Wood Preservers wishes to pursue such discussions in the absence of litigation, it is suggested those discussions be initiated soon so that they may be completed before the end of the 60-day notice period.  EDEN reserves the right to file a lawsuit if discussions are continuing when the notice period ends.

Very truly yours,

AIDEN SANCHEZ
Eden Environmental Citizen's Group

Copies to:

Andrew Wheeler:  Wheeler.andrew@Epa.gov
Administrator, U.S. Environmental Protection Agency

State Water Resources Control Board
Eileen Sobeck, Executive Director
eileen.sobeck@waterboards.ca.gov
Mayumi Okamoto, Office of Enforcement:
Mayumi.Okamoto@waterboards.ca.gov
stormwater@waterboards.ca.gov

Regional Administrator, U.S. EPA – Region 9
Jennifer Pierce:  pierce.jennifer@epa.gov
Laurie Kermish:  Kermish.Laurie@epa.gov